**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**
*Electronically Filed*

DELANA WHEATON                                    Case No._____
180 JENNINGS ROAD
GLENCOE, KY 41046                                 Judge:

    **PLAINTIFF**

v.                                                **COMPLAINT & JURY DEMAND**

WEST CHESTER HOSPITAL, LLC
c/o GH&R BUSINESS S V C S ., INC.
511 WALNUT STREET
1900 FIFTH THIRD CENTER
CINCINNATI, OH 45202
(Serve via Certified Mail)

And

UC HEALTH
c/o GH&R BUSINESS S V C S ., INC.
511 WALNUT STREET
1900 FIFTH THIRD CENTER
CINCINNATI, OH 45202
(Serve via Certified Mail)

And

CENTER FOR ADVANCED SPINE TECHNOLOGIES
c/o CT CORPORATION SYSTEM
1300 EAST NINTH STEET, #1010
CLEVELAND, OHIO 44144
(Serve via Certified Mail)

And

ABUBAKAR ATIQ DURRANI, M.D.
     ORTHOPEDIC AND SPINE INSTITUTE
     15-G-1 JOHAR TOWER
     LAHORE, PAKISTAN

     8 R MODEL TOWER EXT,
     LAHORE, PAKISTAN

     198-C JAMILABED CHUNGI,
     MULTAN, PAKISTAN

And

MEDTRONIC, INC., a Minnesota Corporation,
c/o CT CORPORATION SYSTEM
1300 EAST NINTH STEET, #1010
CLEVELAND,   OHIO  44144
(Serve via Certified Mail)

And

MEDTRONIC SOFAMOR DANEK USA, INC.,
a Tennessee corporation,
c/o CT CORPORATION SYSTEM
1300 EAST NINTH STEET, #1010
CLEVELAND,   OHIO  44144
(Serve via Certified Mail)

And

ALPHATEC SPINE, INC.
c/o Ebun S. Garner
5818 El Camino Real
Carlsbad, CA  92008
(Serve via Certified Mail)

And

ALPHATEC HOLDINGS, INC.
c/o Corporation Service Company
2711 Centerview Rd., Suite 400
Wilmington, DE  19808
(Serve via Certified Mail)

And

PARCELL LABORATORIES, LLC
c/o United State Corporation Agents, Inc.
1521 Concord Pike, Suite 301
Wilmington, DE  19803
(Serve via Certified Mail)

And

NEW ENGLAND CRYOGENIC
CENTER (NECC)
153 Needham Street
Newton, MA
(Serve via Certified Mail)

And

INNOVATIVE MEDICAL
CONSULTANTS, LLC
324 Countryside Drive
Broadview Hts, OH  44147
(Serve Nick B. Trankito
 via Certified Mail)


**DEFENDANTS**

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiffs exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiffs and the Defendant.

2. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because Defendants' conduct substantial business in this District.

3. This Court has personal jurisdiction over the Defendants because they have done business in the State of Kentucky, have committed a tort in whole or in part in the State of Kentucky, have substantial and continuing contact with the State of Kentucky, and derive substantial revenue from goods used and consumed within the State of Kentucky and have office facilities in Kentucky.

## PARTIES

4. At all times relevant, Plaintiff, Delana Wheaton, was a resident of and domiciled in Gallatin County, Kentucky.

5. At all times relevant, West Chester Hospital, LLC ("West Chester Hospital") was a limited liability company authorized to transact business and perform medical and treatment services in the State of Ohio and was operating under the trade name West Chester Hospital. Upon information and belief, the sole member of Defendant West Chester Hospital, LLC is UC Healthcare System. UC Healthcare System is a corporation incorporated under the laws of the State of Ohio with its principal place of business at 3200 Burnett Avenue, Cincinnati, Ohio 45229.

6. At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and shared certain medical care, surgical care and services, and made income and profits from providing said services and also share liabilities for negligent care and treatment of patients including the Plaintiff herein including treatment at West Chester Hospital, LLC. Upon information and belief, the sole member of Defendant UC Health, LLC is UC Healthcare System. UC Healthcare System is a corporation

incorporated under the laws of the State of Ohio with its principal place of business located at 3200 Burnett Avenue, Cincinnati, Ohio 45229.

7. Defendant the Center for Advanced Spine Technologies, Inc. is a corporation under the laws of Ohio with its principal place of business located at 4555 Lake Forest Drive, Suite 150, Cincinnati, Ohio 45242 and provides medical offices and is owned in whole or in part by Defendant Dr. Durrani.  The agent for service of process is CT Corporation, 1300 East 9th Street, Suite 1010, Cleveland, OH  44114.

8. Defendant Dr. Durrani is/was licensed to practice medicine in the State of Ohio and the Commonwealth of Kentucky, has been indicted for Medicare fraud related to unnecessary surgeries, and performed the surgery on Plaintiff involving PureGen and/or Infuse. At the time of the actions in question, Dr. Durrani was a resident and citizen of Cincinnati, Ohio. On belief Dr. Durrani currently resides in Pakistan, a country with whom there is no internationally agreed means of perfecting service of summons, but can be served via e-mail at adurrani.yourspinedoctor@gmail.com.

9. Defendant Medtronic, Inc. ("Defendant Medtronic") is a Minnesota corporation, with its principal place of business located at 710 Medtronic Parkway, Minneapolis, Minnesota 55432. Defendant Medtronic conducts business in the State of Ohio (hereinafter Product Defendants).

10. Defendant Medtronic Sofamor Danik USA, Inc. ("Defendant Medtronic Sofamor") is a Tennessee corporation, with its principal place of business located at 1800 Pyramid Place, Memphis, Tennessee 38132. Defendant Medtronic Sofamor is a wholly owned subsidiary of Defendant Medtronic and conducts business in the State of Ohio and Kentucky (hereinafter Product Defendants).

11. Defendants Medtronic and Medtronic Sofamor (collectively "Product Defendants") are now and at all times relevant to this Complaint were, in the business of inventing, designing, manufacturing, creating, constructing, assembling, inspecting, and selling various types of medical drugs and devices, including spinal surgery drugs, solutions, hormones and devices, and specifically the INFUSE Bone Graft Bonegrowth Stimulator ("INFUSE").

12. At all times herein mentioned, "Product Defendants" and their aggregates, subsidiaries, corporates, limited liability companies, associates, and partners were the agent, servant, employee, assignee, permissive user, successor in interest or joint venture of each other, and were acting within the time, purpose or scope of such agency or employment or with permission actual and implied authority. And all acts or omissions alleged herein of each such "Product Defendants" were authorized, adopted, approved, or ratified by each of the other Product Defendants its agents, employees, officers, directors, contractors and subcontractors.

13. At all times herein mentioned, the officers and directors, employees, agents, contractors, subcontractors of the Product Defendants authorized and directed the production and/ or participated in the "off- label" promotion and use of Infuse® when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the "off- label" use of Infuse®, and thereby actively participated in the tortious, negligent, careless conduct which caused and contributed to and resulted in the physical injuries described herein.

14. At all times herein mentioned, each Product Defendant was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of the other and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

15. Defendant Alphatec Spine, Inc. is a corporation under the laws of California, with its principal place of business located at 5818 El Camino Real, Carlsbad, Calfiornia 92008. Defendant Alphatec Spine, Inc. jointly developed and distributes PureGen in the State of Ohio. The agent for service of process is Ebun S. Garner, 5818 El Camino Real, Carlsbad, CA 92008.

16. Defendant Alphatec Holdings, Inc. is a holding corporation formed under the laws of Delaware with its principal place of business located at 5818 El Camino Real, Carlsbad, California 92008. Defendant Alphatec Holdings, Inc. has no operations separate from the holding of other companies which owns Alphatec Spine, Inc. The agent for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Washington, DE 19808. (hereinafter Product Defendants).

17. Defendant Parcell Laboratories, LLC is organized under the laws of Delaware and jointly developed PureGen. The agent for service of process is United States Corporation Agents, Inc., 1521 Concord Pike, Suite 301, Wilmington, DE 19803 (hereinafter Product Defendants). Upon information and belief, the sole member of Parcell Laboratories, LLC is Pamela G. Layton. On all publicly available records for Parcell Laboratories, LLC, Pamela Layton listed her address as 153 Needham St., Newton, Massachusetts 02464,

which is the principal place of business for Defendant New England Cryogenic Center, Inc. Upon information and belief, Pamela Layton is a resident and citizen of Westwood, Massachusetts.

18. Defendant New England Cryogenic Center, Inc. (NECC) is a corporation organized under the laws of the State of Massachusetts with its principal place of business located at 153 Needham Street, Building One, Newton, MA 02464. Defendant New England Cryogenic Center, Inc., whose service of registered agent is Joseph Rizza and which business is wholly owned by Parcell Laboratories, LLC, manufactured and produced PureGen for the Co-Defendants herein named.

19. Defendant Innovative Medical Consultants, LLC is a limited liability company organized under the laws of the State of Ohio. Upon information and belief, Nick B. Trankito is the sole member of Innovative Medical Consultants, LLC. Nick B. Trankito is a resident and citizen of Broadview Heights, Ohio residing at 324 Countryside Dr., Broadview Heights, Ohio 44147.  Innovative Medical Consultants, by and through employees, sales agents, and representatives market, distribute, sell and place into the stream of commerce the PureGen upon information and belief that was implanted into Plaintiff.

## FACTUAL ALLEGATIONS

20. Plaintiff sought treatment with Dr. Abubaker Atiq Durrani in January 2010 because of intermittent pain in her back (hereinafter "Durrani").

21. Durrani recommended surgical procedures on the first visit.

22. On April 30, 2012, Durrani performed a lumbar fusion surgery on Plaintiff at West Chester Hospital.

23. Following this surgery Plaintiff continued to experience pain. Durrani told her to give it a year to heal.

24. Plaintiff continued to follow up with Durrani and complain of pain. Durrani scheduled another surgery.

25. On October 29, 2012 Durrani performed a cervical fusion on Plaintiffs at West Chester Hospital.

26. That Defendant Durrani, a resident of the State of Ohio at the time of the events alleged herein, has fled the jurisdiction and currently resides at an unknown address in the Country of Pakistan.

27. Upon information and belief, Durrani used Infuse/BMP-2 in "off -label" manner and/or PureGen was used in his surgical procedures without Plaintiff's knowledge or consent, causing Plaintiff harm and permanent injury.

28. Upon information and belief, Plaintiff had PureGen used upon her and, specifically,

    a. Puregen was implanted into the Plaintiff during a spine surgery without the informed consent of the Plaintiff;
    b. At the time of the surgery in which Puregen was used on the Plaintiff, Puregen was not FDA approved for use in the human spine;
    c. At the time of the surgery in which Puregen was used on the Plaintiff was not knowingly enrolled in a clinical trial;
    d. At the time of the surgery in which Puregen was used on the Plaintiff, Puregen was not subject to an Investigational New Drug (IND) application;

29. Furthermore Defendants had not applied for nor obtained approval by the FDA to conduct test of Puregen on individuals nor had obtained, filed and applied for a Biological License Application (BLA).

30. Upon information and belief, the surgeries performed by Durrani were medically unnecessary and improperly performed.

31. As a direct and proximate result of Plaintiff's surgeries, Durrani's negligence, and the Co-Defendants' negligence, improper and negligently credentialing or negligent retention as unethical use of non-FDA approved products. Plaintiff has suffered harm and damages in such amounts as the proof may show.

32. Plaintiff was not aware of Medtronic InfuselBMP-2 and/or PureGen product, or that he may have suffered injury as a result of malpractice by Durrani, and the damages and injury that could be and was caused by his treatment, until the recent publicity in January, 2015, that included reports that Durrani may not have been a medical doctor and about the use of unapproved medical products.

## COUNTS AGAINST DURRANI AND CAST
### COUNT I – NEGLIGENCE

33. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

34. Defendant Durrani and CAST owed Plaintiff the duty to exercise the degree of skill, care and diligence that a reasonably competent and prudent physician and health-care provider would have exercised under like or similar circumstances.

35. Defendants breached these duties by failing to exercise the requisite degree of skill, care, and diligence that ordinary competent and prudent health care providers, specialists, and surgeons would have exercised under the same or similar circumstances through, among other things, negligent surgery, improper diagnosis, and medical mismanagement of

Plaintiff, including but not limited to unnecessary surgery, failed surgery, improper performance of surgery, and improper follow-up care addressing the patient's concerns.

36. At all relevant times herein, Defendant Durrani was an employee of Defendant CAST and formed services on Plaintiff within the scope of that employment such that CAST is vicariously liable for all his conduct.

37. The aforementioned acts and omissions by the Defendants were the direct and proximate cause of and substantial factors in causing Plaintiff to sustain severe and grievous injuries, prolonged pain and suffering, emotional distress, discomfort, loss of enjoyment of life, loss of time and wages, permanent impairment of ability to earn income, loss of the ability to perform usual and customary activities, and substantial medical expenses and treatment.  These damages will continue on into the future indefinitely.

## COUNT II – BREACH OF DUTY OF FIDELITY

38. Plaintiff incorporates, adopts and re-alleges as if fully restated herein, those allegations contained in the above paragraphs.

39. Defendant, Dr. Durrani, owed Plaintiff the duty of fidelity to act with the utmost good faith and to speak fairly and truthfully, to fully disclose his findings on examination and the opinions he held, to inform her of the diagnosis and the known risks or dangers inherent therein so that she could make an intelligent decision regarding the course of treatment, and if her ailment was beyond said Defendant's knowledge, ability or capacity to treat with reasonable success, he had a duty to disclose the situation to Plaintiff and to advise her to consult another specialist.

40. Defendant Durrani breached these duties by failing to act with the utmost good faith and to speak fairly and truthfully to Plaintiff, making material misrepresentation to her about his abilities and the need for and nature of the surgical procedures he was intending to

perform, failing to fully disclose his findings on examination and the opinions he held with regard to Plaintiff's condition, failing to inform her of the accurate and true diagnosis and the known risks or dangers inherent therein so that she could make an intelligent decision regarding the course of treatment and failing to advise her of his conflict of interest.

41. The aforementioned acts and omissions by Defendant Durrani were the direct and proximate cause of and were substantial factors in causing Plaintiff to sustain severe and grievous injuries, prolonged pain and suffering, emotional distress, discomfort, loss of enjoyment of life, loss of time and wages, permanent impairment of ability to earn income, loss of the ability to perform usual and customary activities, and substantial medical expenses and treatment.  These damages will continue on into the future indefinitely.

## COUNT III – LACK OF INFORMED CONSENT

42. Plaintiff incorporates, adopts and re-alleges as if fully restated herein, those allegations contained in the above paragraphs.

43. As set forth in KRS 304.40-320 and the common law of Kentucky, Defendant Durrani had a duty to obtain informed consent from Plaintiff prior to rendering medical treatment to her.

44. This duty included that Defendant provide such information to Plaintiff that a reasonable individual, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedure to be performed and medically acceptable alternative procedures or treatments, and the substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health-care providers who perform similar treatment or procedures.

45. Defendant Durrani failed to obtain informed consent by failing to provide Plaintiff with information such that she would have a general understanding of the procedures that he performed on her, medically acceptable alternatives, and the substantial risks and hazards of the treatments and procedures, that are recognized among the medical community.

46. Defendant Durrani's, breach of informed consent were the direct and proximate cause of and were a substantial factor in causing Plaintiff to sustain several and grievous injuries, prolonged pain and suffering, emotional distress, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, loss of time and wages, permanent impairment of ability to earn income, and substantial medical expenses and treatment.

**COUNT IV: DURRANI'S USE OF INFUSE and/ or PUREGEN**

47. Durrani oftentimes used INFUSE BMP-2 "off-label", or PureGen when performing surgeries.

48. Durrani was a consultant for Medtronic and he owned an interest in PureGen.

49. Defendants, jointly and severally, did not inform Plaintiff of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic and PureGen.

50. Medtronic, provided in writing to Durrani and CAST the approved uses for rhBMP-2/Infuse, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

51. RhBMP-2/Infuse is not approved by the Food and Drug Administration for use in the cervical and thoracic spine; PureGen is not approved for any use by the FDA.

52. RhBMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure in the lumbar spine: Anterior Lumbar Interbody Fusion ("AUF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

53. Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical or thoracic spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

54. Puregen and off-label use of Infuse frequently causes excessive or uncontrolled bone growth on or around the spinal cord and directly causes nerves to be compressed by such excessive bone growth, with the result that patients can experience among other adverse events, intractable pain, paralysis, spasms and cramps in the limbs, difficulty breathing and difficulty swallowing.

55. The product packaging for rhBMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

56. Durrani, and CAST staff and employees, West Chester/UC Health personnel did not disclose to Plaintiff their intent to authorize, promote and permit use of PureGen and/or rhBMP-2/Infuse, and further, did not disclose their intent to use rhBMP-2/Infuse in a way not approved by the FDA.

57. Upon information and belief, Durrani and CAST, its employees, agents, and physicians used PureGen and/or rhBMP-2/Infuse on Plaintiff in manners not approved by the FDA.

58. Defendants, jointly and severally, did not inform Plaintiff that Durrani and CAST, its employees and physicians used PureGen and/or rhBMP-2/Infuse in his surgeries.

59. Plaintiff would not have allowed PureGen and/or rhBMP-2/Infuse to be used by Durrani and CAST employees and physicians in his surgeries in a manner that was not approved by the FDA had he been properly informed and had he been warned of the known side effects of use of the PureGen and/or rhBMP-2/Infuse.

60. Plaintiff did not sign any consent agreement in which he was fully advised to the use of PureGen and/or rhBMP-2/Infuse in his body and was not informed of the risks by Durrani, CAST staff and employees, or any West Chester UC Health personnel.

61. Any written informed consent, if any such form exist, provided him by Durrani, CAST, its employees and physicians and West Chester/UC Health, its employees, nurses and physicians signed by Plaintiff lacked the disclosure of PureGen and/or rhBMP-2/Infuse's use in his procedures and lacked disclosure of neck swelling, cancer, sterility, excessive bone growth and other adverse consequences caused by its use.

62. Plaintiff never received a verbal disclosure of PureGen and/or rhBMP-2/Infuse from Durrani, CAST staff and employees, or any West Chester/UC Health personnel, employees, physicians, agents, contractors, subcontractors or personnel.

63. Medtronics label for approved use of Infuse required at least six (6) months of non-operative treatment prior to use of rhBMP-2/Infuse, but which requirement Durrani,

CAST, its employees, agents and physicians ignored and disregarded to the detriment and damages of Plaintiff.

64. Durrani, CAST, its employees and physicians regularly used rhBMP-2/Infuse without this six (6) month non- operative treatment.

65. The FDA approved required rhBMP-2/Infuse be used in conjunction with a metal LT cage at the L-5 to S-1 only but which labeling and use was disregarded by all Defendants and for which all Defendants are liable, jointly and severally.

66. Durrani, CAST employees and physicians regularly used rh BMP-2/Infuse without a proper LT cage in his surgeries and which procedures and use all Defendants knew or should have known was "off label" and which use directly and causally caused to Plaintiff damages and which damages all Defendants are liable, jointly and severally.

67. Durrani, CAST employees and physicians regularly used PureGen without proper FDA approval, which use directly and causally caused to Plaintiff damages and which damages all Defendants are liable, jointly and severally.

## COUNT V – FRAUD

68. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

69. Defendant Durrani and CAST, made material, false representations related to Plaintiff's treatment including: stating the surgeries were necessary, that Defendant Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that Plaintiff would suffer adverse consequences if she did not have the surgeries, that the procedures were medically necessary and that the surgeries were successful.

70. Defendant Durrani and CAST, also fraudulently concealed and failed to disclose hidden and material facts, where the circumstances set forth herein placed an obligation on

Defendant Durrani, CAST, to make such disclosures.  The fraudulent concealment and failures to disclose include without limitation, failing to act with the utmost good faith and to speak fairly and truthfully to Plaintiff, failing to fully disclose their findings on examination and the opinions they held with regard to Plaintiff's condition, failing to inform Plaintiff of the accurate and true diagnosis and the known risks or dangers inherent therein so that she could make an intelligent decision regarding the course of treatment, failing to disclose the lack of medical necessity of procedures Defendant Durrani performed on her at West Chester Hospital and failing to disclose to Plaintiff that Defendant Durrani was habitually performing unnecessary surgery and that his billing practices were fraudulent.

71. Defendant Durrani and CAST, knew, or should have known, that his medical and surgical opinions were false, and/or included misrepresentations with utter disregard and recklessness as to their truth or falsity.  Defendant Durrani and CAST, further knew of the concealed facts and knew of their obligation to disclose material facts, yet they chose not to make such disclosures or were recklessly indifferent as to making those disclosures.

72. Defendant Durrani manipulated his diagnosis and the medical test to recommend surgery that he knew was not indicated.  Defendant Durrani was operating a scam in which he would receive referrals through the facility and the medical community and perform those surgeries on whomever his patients were regardless of medical need, all of which was known, or should have been known by all Defendants.

73. Defendants Durrani and CAST, made the misrepresentations, concealments and failures to disclose both before and after the surgeries with the intent of misleading Plaintiff into

reliance upon them.  Specifically, the misrepresentations were made to induce payment for the surgeries performed by Defendant Durrani and to induce Plaintiff to undergo the surgeries without regard to medical need.

74. Plaintiff did in fact rely and was justified in her reliance on the misrepresentations, concealments and failures to disclose because a patient has a right to trust their physician, and that the facility is overseeing the physician to ensure the patients of that facility that the physician is competent and trustworthy.  Plaintiff relied on the facility's holding Defendant Durrani out as a surgeon and allowing him to perform surgeries at their health-care facility as assurance that the facility was overseeing Defendant Durrani and vouching for his surgical abilities.  The facility expected this reliance and requires patients to trust the facility to only allow surgeons who are competent and trustworthy to perform surgeries there.

75. Defendant Durrani's scheme required the cooperation, either through complicity or through affirmative support, of the facilities at which he operated; they either had to turn a blind eye to what was happening or take steps to support it, otherwise it would have been impossible for Defendant Durrani to perpetrate the wrongful acts he committed on Plaintiff.

76. The fraud of Defendant Durrani and CAST, set forth in the preceding paragraphs was the direct and proximate cause of and a substantial factor in causing Plaintiff to undergo unnecessary and negligently performed surgeries and in causing her to suffer severe and grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, discomfort, loss of enjoyment of life, loss of ability to perform usual and customary activities, loss of time and wages, permanent impairment of ability to earn

income, and substantial medical expense and treatment.  These damages are continuing

into the future indefinitely.

## COUNT VI – CIVIL CONSPIRACY / JOINT VENTURE

77. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

78. Defendants Durrani and CAST, tacitly, implicitly, and/or expressly entered into an

unlawful or corrupt combination, or agreement to do by concerted action, the wrongful

acts alleged herein by providing the financial support, control, medical facilities, medical

devices, hardware, and products, billing and insurance payment support, staff support,

medicines and tangible items for use on patients, including Plaintiff.

79. Defendants Durrani and CAST, profited from such wrongful conduct at the expense and

to the harm of Plaintiff.

80. Defendants Durrani and CAST's, acts and omissions were the direct and proximate cause

and substantial factors in causing Plaintiff to sustain severe and grievous injuries,

prolonged pain and suffering, emotional distress, discomfort, loss of enjoyment of life,

loss of the ability to perform usual and customary activities, loss of time and wages,

permanent impairment of ability to earn income, and substantial medical expenses and

treatment.  These damages will continue on into the future indefinitely.

## COUNT VII – PUNITIVE DAMAGES

81. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

82. The conduct of Defendants Durrani and CAST, referenced above constitutes oppression,

fraud, malice, reckless indifference, wanton conduct and/or gross negligence sufficient to

warrant the imposition of punitive damages under Kentucky law.

## COUNTS AGAINST WEST CHESTER HOSPITAL AND UC HEALTH

## COUNT I – NEGLIGENCE

83. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

84. Defendants UC Health and West Chester Hospital were responsible for the hiring, credentialing, granting of staff privileges, screening over and conduct of its residents, physicians, nurses and those physicians with privileged at West Chester Hospital.

85. Defendants UC Health and West Chester Hospital were in a unique position to control monitor and oversee the conduct of its staff physicians, including Defendant Durrani.

86. Defendants West Chester Hospital and UC Health owed Plaintiff the duty to exercise the degree of skill, care, and diligence a reasonably competent and prudent health-care provider would have exercised under like or similar circumstances including the duty to reasonably credential, grant privileges to and monitor its medical staff.

87. The Defendants, West Chester Hospital and UC Health, did so negligently credential, grant privileges to, and monitor Defendant Durrani such that he was permitted to perform the aforementioned surgery on Plaintiff, causing her severe injury, prolonged pain and suffering emotional distress, discomfort, loss of enjoyment of life, loss of time and wages, permanent impairment of ability to earn income, loss of the ability to perform usual and customary activities, and substantial medical expenses and treatment.  These damages will continue on into the future indefinitely.

## COUNT II – LACK OF INFORMED CONSENT

88. Plaintiff incorporates, adopts and re-alleges as if fully restated herein, those allegations contained in the above paragraphs.

89. West Chester Hospital did not obtain Plaintiff's informed consent to the same procedures.

90. Plaintiff would not have agreed to the surgeries if she knew that the surgeries were not medically necessary.

91. Defendant UC Health and West Chester Hospital's breach of informed consent were the direct and proximate cause of and were a substantial factor in causing Plaintiff to sustain several and grievous injuries, prolonged pain and suffering, emotional distress, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, loss of time and wages, permanent impairment of ability to earn income, and substantial medical expenses and treatment.

### COUNT III – FRAUD

92. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

93. Defendant West Chester Hospital and UC Health made material, false representations related to Plaintiff's treatment including: stating the surgeries were necessary, that Defendant Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that Plaintiff would suffer adverse consequences if she did not have the surgeries, that the procedures were medically necessary and that the surgeries were successful.

94. Defendant West Chester Hospital and UC Health also fraudulently concealed and failed to disclose hidden and material facts, where the circumstances set forth herein placed an obligation on Defendant West Chester Hospital and UC Health to make such disclosures. The fraudulent concealment and failures to disclose include without limitation, failing to act with the utmost good faith and to speak fairly and truthfully to Plaintiff, failing to fully disclose their findings on examination and the opinions they held with regard to Plaintiff's condition, failing to inform Plaintiff of the accurate and true diagnosis and the known risks or dangers inherent therein so that she could make an intelligent decision regarding the course of treatment, failing to disclose the lack of medical necessity of procedures Defendant Durrani performed on her at West Chester Hospital and failing to

disclose to Plaintiff that Defendant Durrani was habitually performing unnecessary
surgery and that his billing practices were fraudulent.

95. Defendant West Chester Hospital and UC Health knew, or should have known, that his
medical and surgical opinions were false, and/or included misrepresentations with utter
disregard and recklessness as to their truth or falsity.  Defendant West Chester Hospital
and UC Health further knew of the concealed facts and knew of their obligation to
disclose material facts, yet they chose not to make such disclosures or were recklessly
indifferent as to making those disclosures.

96. Defendant Durrani manipulated his diagnosis and the medical test to recommend surgery
that he knew was not indicated.  Defendant Durrani was operating a scam in which he
would receive referrals through the facility and the medical community and perform
those surgeries on whomever his patients were regardless of medical need, all of which
was known, or should have been known by all Defendants.

97. Defendants West Chester Hospital and UC Health made the misrepresentations,
concealments and failures to disclose both before and after the surgeries with the intent of
misleading Plaintiff into reliance upon them.  Specifically, the misrepresentations were
made to induce payment for the surgeries performed by Defendant Durrani and to induce
Plaintiff to undergo the surgeries without regard to medical need.

98. Plaintiff did in fact rely and was justified in her reliance on the misrepresentations,
concealments and failures to disclose because a patient has a right to trust their physician,
and that the facility is overseeing the physician to ensure the patients of that facility that
the physician is competent and trustworthy.  Plaintiff relied on the facility's holding
Defendant Durrani out as a surgeon and allowing him to perform surgeries at their health-

care facility as assurance that the facility was overseeing Defendant Durrani and vouching for his surgical abilities. The facility expected this reliance and requires patients to trust the facility to only allow surgeons who are competent and trustworthy to perform surgeries there.

99. Defendant Durrani's scheme required the cooperation, either through complicity or through affirmative support, of the facilities at which he operated; they either had to turn a blind eye to what was happening or take steps to support it, otherwise it would have been impossible for Defendant Durrani to perpetrate the wrongful acts he committed on Plaintiff.

100. The fraud of Defendant West Chester Hospital and UC Health set forth in the preceding paragraphs was the direct and proximate cause of and a substantial factor in causing Plaintiff to undergo unnecessary and negligently performed surgeries and in causing her to suffer severe and grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, discomfort, loss of enjoyment of life, loss of ability to perform usual and customary activities, loss of time and wages, permanent impairment of ability to earn income, and substantial medical expense and treatment. These damages are continuing into the future indefinitely.

### COUNT IV – CIVIL CONSPIRACY / JOINT VENTURE

101. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

102. Defendants West Chester Hospital and UC Health tacitly, implicitly, and/or expressly entered into an unlawful or corrupt combination, or agreement to do by concerted action, the wrongful acts alleged herein by providing the financial support, control, medical facilities, medical devices, hardware, and products, billing and insurance payment

support, staff support, medicines and tangible items for use on patients, including Plaintiff.

103. Defendants West Chester Hospital and UC Health profited from such wrongful conduct at the expense and to the harm of Plaintiff.

104. Defendants West Chester Hospital and UC Health's acts and omissions were the direct and proximate cause and substantial factors in causing Plaintiff to sustain severe and grievous injuries, prolonged pain and suffering, emotional distress, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, loss of time and wages, permanent impairment of ability to earn income, and substantial medical expenses and treatment. These damages will continue on into the future indefinitely.

## COUNT V – PUNITIVE DAMAGES

105. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

106. The conduct of Defendants West Chester Hospital and UC Health referenced above constitutes oppression, fraud, malice, reckless indifference, wanton conduct and/or gross negligence sufficient to warrant the imposition of punitive damages under Kentucky law.

## COUNT VI: VICARIOUS LIABILITY AND AGENCY BY ESTOPPEL

107. West Chester Hospital/UC Health, its agents, employees, representatives, nurses, residents, doctors, contractors or subcontractors, Dr. Durrani, and CAST are liable to Plaintiff pursuant to respondeat superior for the torts of its employees and/or agents.

108. West Chester Hospital/UC Health its agents, employees, representatives, nurses, residents, doctors, and outside physicians, contractors or subcontractors, Dr. Durrani and CAST are liable to Plaintiff pursuant to the doctrine agency by estoppel.

109. West Chester Hospital/UC Health are liable for the negligence of its , its agents, employees, representatives, nurses, residents, doctors, contractors or subcontractors and physicians who are not its employees by virtue of Defendants' holding themselves out to the public as being a provider of medical services, and Plaintiff had no knowledge, actual or implied, to the contrary, and Plaintiff relied upon the representation, advertising, and publicity offered by Defendants that the hospital would provide competent care but which representations were not true.

110. West Chester Hospital/UC Health are estopped from claiming its agents, employees, representatives, nurses, residents, doctors, contractors or subcontractors, the physicians and specifically Dr. Durrani are independent contractors and said Defendants are estopped from asserting other Defendants' responsibility for Plaintiff's injuries as a defense.

## COUNTS AGAINST MEDTRONICS /PRODUCT DEFENDANTS
## COUNT I PRODUCTS LIABILITY

111. At all times rhBMP-2/Infuse and PureGen were products as defined in O.R.C.§ 2307.71(A)(l2) and applicable law.

112. West Chester Hospital/UC Health (aka supplier) its agents, employees, representatives, nurses, residents, doctors, contractor or subcontractors supplied Medtronic's (aka manufacturer) rhBMP-2/Infuse and/or PureGen for surgeries performed by Durrani on Plaintiff.

113. West Chester Hospital/UC Health, its agents, employees, representatives, nurses, residents, doctors, contractor or subcontractors did not adequately warn Plaintiff

that rhBMP-2/Infuse and/or PureGen would be used without all FDA and manufacturer required components.

114. West Chester Hospital/UC Health, its agents, employees, representatives, nurses, residents, doctors, contractor or subcontractors did not obtain informed consent from Plaintiff for the use of rhBMP-2/Infuse and/or PureGen, or warn of the potential danger and consequences of off-label use of the products without FDA and manufacturer requirements.

115. West Chester Hospital/UC Health, its agents, employees, representatives, nurses, residents, doctors, contractor or subcontractors failed to provide any warning or instruction in regard to rhBMP-2/Infuse, and/or PureGen and failed to make sure any other party gave such warning or instruction.

116. West Chester Hospital/UC Health, its agents, employees, representatives, nurses, residents, doctors, contractor or subcontractors substantially benefited financially by the use of the products as the products allowed for Defendant to charge more for the surgeries.

117. Plaintiff suffered mental and physical harm due to West Chester Hospital/UC Health, its agents, employees, representatives, nurses, residents, doctors, contractor or subcontractors' acts and omissions.

## COUNT II: CONSUMER PROTECTION ACT

118. Although the Ohio Consumer Sales Practices statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

119. West Chester Hospital/UC Health's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

120. West Chester Hospital/UC Health omitted, suppressed and concealed from Plaintiff facts with the intent that Plaintiff would rely on these omissions, suppressions and concealments as set forth herein.

121. West Chester Hospital/UC Health's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and Substantive Rules and case law.

122. West Chester Hospital/UC Health was fully aware of its actions.

123. West Chester Hospital/UC Health was fully aware that Plaintiff was induced by and relied upon West Chester Hospital/UC Health's representations at the time they were engaged by Plaintiff.

124. Had Plaintiff been aware that and West Chester Hospital/UC Health's representations as set forth above were untrue, Plaintiff would not have used the services of Defendants.

125. and West Chester Hospital/UC Health, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

126. and West Chester Hospital/UC Health's actions were not the result of any bona fide

errors.

127. As a result of and West Chester Hospital/UC Health's unfair, deceptive and

unconscionable acts and practices, Plaintiff has suffered and continues to suffer

damages, which include, but are not limited to the following:

a.   Loss of money paid
b.   Severe aggravation and inconveniences
c.   Under O.R.C. 1345.01 Plaintiff is entitled to:
       i.   An order requiring West Chester Hospital/UC Health to restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;
     ii.   All incidental and consequential damages incurred by Plaintiff;
    iii.   All reasonable attorneys' fees, witness fees, court costs and other fees incurred.

## COUNT III: NEGLIGENCE

128. The Product Defendants had a duty to exercise reasonable care in the design,

testing, manufacture, warning, marketing, distribution, and/or sale of rhBMP-

2/Infuse including a duty to ensure that it did not cause injury to individuals in

which it was placed and or injected or applied..

129. The Product Defendants owed a duty of reasonable care to Plaintiff and were

required to protect her against the foreseeable risk of harm posed by the off-label

use of rhBMP-2/Infuse.

130. The Product Defendants breached their duty of care owed to Plaintiff to protect

her from an unreasonable risk of harm in that they negligently and carelessly,

researched, tested, manufactured, designed, developed, distributed, advertised,

marketed, inspected, configured, failed to warn and/or sold rhBMP-2/Infuse to

physicians and hospitals for use in patients like Plaintiff.

131. The Product Defendants were negligent by, *inter alia:*

    a. engaging in the illegal off-label promotion of rhBMP-2/Infuse by recommending to physicians, including Plaintiff's physicians, and instructing them to use it in procedures for which it had not been approved;

    b. instructing, promoting and directing the use of rhBMP-2/Infuse in procedures that had not been approved by the FDA;

    c. failing to disclosure to physicians that the off-label use of rhBMP-2/Infuse can result in serious side effects;

    d. failing to fully disclose the results of the testing and other information in its possession regarding the possible adverse reactions associated with the off-label use of rhBMP-2/Infuse;

    e. representing that the off-label use of the rhBMP-2/Infuse was safe when, in fact, it was unsafe;

    f. promoting rhBMP-2/Infuse beyond the narrow and limited uses for which it was approved;

    g. failing to adequately warn the medical community, the general public, Plaintiff's physicians, and Plaintiff of the dangers, contraindications, and side effects from the off-label use of rhBMP-2/Infuse; and

    h. failing to act as a reasonably prudent drug manufacturer by, *inter alia,* commissioning studies which misrepresented the risks associated with off-label use of rhBMP-2/Infuse and compensating the authors of the above studies monetarily for their opinions.

132. The rhBMP-2/Infuse drug implanted, applied, injected, placed into Plaintiff was defective when it left the hands of the Product Defendants.

133. The Product Defendants further negligently failed to warn or alert Plaintiff of the dangers and hazards associated with the off-label use of rhBMP-2/Infuse.

134. The Product Defendants knew or should have known that the off-label use of rhBMP-2/Infuse was unreasonably dangerous and harmful to persons who

would h a v e i t used on them and which use was foreseeable and intended by Product Defendant.

135. As a direct and proximate result of the Product Defendants' negligence, carelessness and tortious conduct and violation of FDA Rules and Regulations. Plaintiff has suffered severe and permanent injuries as described above. These injuries have caused him to incur medical, hospital, and drug expenses and, due to the permanent nature of the injuries, will cause her to incur medical, hospital, and drug expenses in the future and for which damages Defendants are jointly and severally liable to Plaintiff.

### COUNT IV: PRODUCTS LIABILITY

136. The Product Defendants in their regular course of business, designed, tested, manufactured, distributed, sold, and/or placed rhBMP-2/Infuse into interstate commerce.

137. The off-label use of rhBMP-2/Infuse in Plaintiff was defective, unsafe, and ineffective, and the Product Defendants knew or should have known that it was unsafe and ineffective when used in an off-label manner as promoted, instructed, and supplied by the Product Defendants, and as utilized in Plaintiff's surgeries.

138. The Product Defendants promoted the off-label use of rhBMP-2/Infuse with t h e knowledge of its risk to patients.

139. The Product Defendants:

    a.  knew that rhBMP-2/Infuse, when used off-label in the manner described above and as promoted and instructed by the Product Defendants, was defective and dangerous in the manner described above;

    b.  knew that, because said use was dangerous and defective when so used off-label, the product could not safely be used for the purpose intended;

      c.   acted in a despicable manner and in conscious disregard of the safety of the public, including the safety of Plaintiff Delana Wheaton, when it placed the product on the market without warning of the defect, despite knowing that said product when used off-label was defective and dangerous; and

      d.   knew when so placed, applied, injected in Plaintiff that it would be used without adequate inspection and review by the FDA for defects but despite said knowledge promoted and marketed its use.

140. By placing said product on the market and promoting said off-label use, the Product Defendants impliedly represented it was safe for the purpose intended, and intended that physicians should rely on their misrepresentations. In doing the things aforementioned, the Product Defendants are guilty of malice, oppression, and fraud, and Plaintiff is therefore entitled to exemplary or punitive damages in a sum according to proof at trial.

141. rhBMP-2/Infuse, when used off-label, was designed in a materially defective manner.

142. The off-label use of rhBMP-2/Infuse was not only reasonably foreseeable, but explicitly intended by the promotion and marketing by the Product Defendants.

143. The Product Defendants knew, or in the exercise of reasonable diligence, should have known of the risk of injury to the Plaintiff, and others like her, from the use of the product.

144. As a direct and proximate result of the Product Defendants defective product, Plaintiff has suffered severe and permanent injuries and damages.

145. The Product Defendants breached the implied warranties of merchantability and fitness because rhBMP-2/Infuse is unsafe for the promoted uses, is not merchantable, is unfit for its promoted use when sold, is unfit for the purpose for which it was sold, and/or is not adequately packaged and labeled, and did not reasonably conform to the promises or affirmations of fact made by the Product Defendants.

146. The actions of the Product Defendants, their agents, servants, and/or employees were wanton, grossly negligent, and reckless and demonstrated a complete disregard and reckless indifference to the safety and welfare of Plaintiff in particular, and to the public generally, in that the Product Defendants did willfully and knowingly promote the off-label use of rhBMP-2/Infuse with the specific knowledge regarding its efficacy, risks, and side effects.

147. Despite their specific knowledge regarding risks as set forth above, the Product Defendants deliberately recommended the off-label use of rhBMP-2/Infuse and promoted it to be safe and effective.

148. The Product Defendants' conduct was malicious, fraudulent, and oppressive toward Plaintiff in particular and the public generally, and the Product Defendants conducted themselves in a willful, wanton, and reckless manner.

149. In doing the things aforementioned, the Product Defendants are guilty of malice, oppression, and fraud, and Plaintiff is therefore entitled to recovery of exemplary or punitive damages in a sum according to proof at trial.

## COUNTS AGAINST PUREGEN DEFENDANTS
## COUNT I: NEGLIGENCE, RECKLESSNESS AND WANTON CONDUCT

150. Upon information and belief PureGen was used in the surgeries performed on Plaintiff.

151. Defendants Alphatec Spine, Inc, Alphatec Holdings, Inc, Parcell Labortories, New England Cryogenic Center, and Innovative Medical Consultants are collectively referred to herein as "PureGen Defendants"

152. Defendants Alphatec and Parcell co-developed the product "PureGen", and both expected PureGen would be initially limited in application.

153. PureGen is produced and distributed by Alphatec Spine, LLC, a division of Alphatec Holdings, Inc.

154. PureGen is a biologics device or product. According to the Public Health Service Act, a valid biologics license is also required to introduce a biologics device to the market.

155. Alphatec Spine did not acquire a valid biologics license to enter a biological product into interstate commerce, in violation of 21 U.S.C. 355(a); 42 U.S.C. 262(a).

156. Dr. Atiq Abubakar Durrani, CAST, its employees and physicians used the product PureGen in its patients and specifically Plaintiff

157. PureGen Defendants knowingly provided PureGen to Dr. Durrani, CAST and its employees and physicians.

158. On information and belief, a representative from Alphatec Spine was in the operating room during medical procedures.

159.  Durrani, CAST and its employees and physicians acted as consultants for PureGen Defendants.

160.  Durrani, CAST and its employees and physicians performed unnecessary surgeries using PureGen on patients and Plaintiff herein.

161.  The Defendants concealed from Plaintiff the serious medical risks and complications to increase profits, specifically concealing that PureGen would be used, omitting that the effectiveness and safety of PureGen had not been determined at that time, and concealed risk factors known by PureGen Defendants at that time.

162. The Defendants, together and individually knew that the surgeries using PureGen were not approved by the FDA (unlicensed) and were being performed without the consent and knowledge of the patients.

163. PureGen Defendants designed, tested, manufactured, marketed, sold, and/or distributed PureGen.

164. At all relevant times herein, PureGen Defendants had a duty to safely and properly design, manufacture, test, inspect, package, label, distribute, market, sell, examine, maintain, supply, provide proper warnings, and prepare for use and sale these products, as well as comply all applicable laws and regulations.

165. PureGen Defendants negligently, recklessly, and/or wantonly breached their duty in one or more ways set forth herein.

166. PureGen Defendants' breaches proximately caused Plaintiff's injuries and damages.

167. At the time PureGen was, upon information and belief, implanted into the Plaintiff, "PureGen" remained unregulated, and was not approved to be sold or used in humans whatsoever.

168. Natural bone allograft and autograft substitutes, such as PureGen, frequently cause excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord.  When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs as well as trouble breathing and swallowing.

169. Following the surgeries, Plaintiff suffered some of these side effects.

170. Plaintiff was misled by PureGen Defendants concerning the extent, nature and duration of the surgeries that were to be performed.

171. PureGen Defendants affirmatively promoted and sold PureGen without a license, in violation of state and federal law.

172. Safe, reasonable and/or adequate warnings and instructions for use of PureGen were not provided to the Plaintiff by the PureGen Defendants.

173. As a direct and proximate result of PureGen Defendants' conduct and violations of the law, Plaintiff suffered harm as alleged in this Complaint.

## COUNT II: PRODUCT LIABILITY

174. PureGen Defendants designed, tested, manufactured, marketed, sold, and/or distributed PureGen with the intention that it be used in spine surgeries such as the surgeries performed on the Plaintiff.

175. The defective condition of PureGen Defendants' product rendered it unreasonably dangerous to the Plaintiff as it was expected to be used.

176. The defective and unreasonably dangerous condition of PureGen Defendants' product proximately caused the Plaintiff's injuries and damages, which were known, or should

have been known through the exercise of ordinary care, by Defendants to be causally associated with such defects.

177. PureGen was defectively designed and manufactured at the time that it left the PureGen Defendants' control and was placed into the stream of commerce in Ohio.  The unlicensed and unapproved drug/biologic reached Plaintiff without a substantial change in the condition in which it was sold.

178. The PureGen product was unreasonably dangerous in that it was unsafe when used as it was promoted by PureGen Defendants for use in spine surgeries.

179. The PureGen product failed to perform as safely as an ordinary consumer would expect.

180. Plaintiff's physicians used the PureGen product in the way PureGen Defendants intended and promoted it to be used.

181. Plaintiff could not have discovered any defect in the PureGen product through the exercise of ordinary care.

182. PureGen Defendants' unreasonably-dangerous and/or defective manufacture of PureGen was the direct, legal and proximate cause of Plaintiff's injuries and damages including, but not limited to, medical hospital expenses and lost wages.

183. As a direct and proximate result of the acts, omissions and/or dangerous conditions described herein, Plaintiff has sustained serious injuries of a personal and pecuniary nature.

184. PureGen Defendants designed, tested, manufactured, marketed, sold and/or distributed PureGen with the intention that it be used in unlicensed, experimental, research, non-FDA approved, and/or secret spinal fusion surgical applications, such as the Plaintiff's.

185. PureGen was defective because PureGen Defendants failed to adequately warn ordinary consumers regarding its use, and the product failed to contain adequate warnings and/or instructions.

186. PureGen Defendants knew, or should have known in light of reasonable available information, that the ordinary consumer, such as the Plaintiff, would not realize the dangerous and defective condition of its product when used in these unlicensed ways.

187. PureGen Defendants' failed to communicate sufficient information, including adequate warnings and/or instructions, to Plaintiff regarding the dangers of PureGen of which they knew or should have known, taking into account the characteristics of, and the ordinary knowledge it has.

188. The defective condition of PureGen Defendants' product rendered it unreasonably dangerous to the Plaintiff.

189. The defective and unreasonably dangerous condition of PureGen Defendants' product, PureGen proximately caused the Plaintiff's injuries, harm or damages.

190. PureGen Defendants further impliedly warranted that PureGen was fit for the particular purpose of treating the Plaintiff.

191. PureGen Defendants breached implied warranties of merchantability and fitness for a particular purpose when its product was sold to the Plaintiff, as PureGen was defective, unmerchantable, and unfit for ordinary use when sold, and unfit for the particular purpose for which it was sold, subjecting the Plaintiff to severe and permanent injuries.

192. As a result of the manufacturer's breach of the implied warranties of merchantability and fitness for a particular purpose, Plaintiff has sustained, and will continue to sustain, injuries and damages.

## PLAINTIFF DAMAGES

193. As a direct and proximate result of the joint and several conduct of Defendants herein, Plaintiff has suffered severe and permanent injuries as described above. These injuries have caused her to incur medical, hospital, and drug expenses and, due to the permanent nature of the injuries, will cause her to incur medical, hospital, and drug expenses in the future.

194. As a further direct and proximate result of the joint and several conduct of Defendants, Plaintiff has suffered severe pain, mental anguish, loss of enjoyment of life, and permanent loss of earning capacity, and due to the permanent nature of the injuries will continue to suffer from severe pain, mental anguish, loss of enjoyment of life, and loss of income in the future.

195. As a direct and proximate result of the aforementioned joint and several conduct of the Defendants, Plaintiff was injured in, on and about her body, both temporarily and permanently; incurred medical expenses, and will do so in the future; had her power to labor and earn money impaired, both past and future; was caused to suffer great pain, both mental and physical, past and future, all to her detriment and damage.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demand judgment against Defendants, jointly and severally, in excess of $25,000, plus attorney fees, costs, punitive damages, pre-judgment interest and for any and all other relief Plaintiff may be entitled to at law or equity.

Respectfully submitted,

*/s/ Paul J. Schachter*
Paul J. Schachter (61750)
Schachter, Hendy & Johnson, PSC
909 Wright's Summit Parkway, Suite 210
Ft. Wright, KY 41011
Phone:(859) 578-4444
Fax: (859) 578-4440
Email: pschachter@pschachter.com

Robert L. Poole
804 Montgomery Road, Suite 700
Cincinnati, OH 45236
Phone: (513) 421-2800
Fax: (859) 261-3928
Email: Robert@robertpoolelaw.com

## **JURY DEMAND**

Plaintiff's make a demand for a jury under all claims.

*/s/ Paul J. Schachter*
Paul J. Schachter